JORGE F. ROMANY, Plaintiff and Appellee, *v.* EL MUNDO, INC., Defendant and Appellant. JORGE F. ROMANY, Plaintiff and Appellant, *v.* EL MUNDO, INC., Defendant and Appellee.

Nos. R-63-11, R-63-14.     Decided December 17, 1963.

*José F. Quetglas Álvarez* for Jorge F. Romany. *Rivera Zayas, Rivera Cestero & Rúa* for El Mundo, Inc.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

In the final edition of the newspaper El Mundo corresponding to Thursday, May 25, 1961, No. 15496, a report was published on the front page relating to the acts committed by Mr. Frank Abella Blanco. The report appears under the following caption which covers two columns: "Attorney is Accused of Shooting and Wounding Two Partners." In the upper left-hand side of the publication and at the same level with the caption Mr. Jorge F. Romany's photograph appears, covering a space of 1-5/8 inches wide by 3 inches high of the column. The name of Mr. Frank Abella Blanco appears, identifying said photograph. The third lower

part of the photograph presents Mr. Romany's body up to the shoulders. Almost all the rest represents his face. In the photograph Mr. Romany is wearing dark glasses, a size larger than ordinary reading glasses. They do not permit seeing his eyes clearly in the photograph.

The information itself covers only one column which starts a little above the center of the photograph, which is on the left-hand side and it starts as follows: "Mr. Frank Abella Blanco was accused yesterday afternoon of two offenses of assault to commit murder, illegal possession and carrying of weapons because of the bullet wounds received in the morning hours by his two partners, José Seraballs Salot and his father, Pedro Seraballs Aulet, at the Santurce Soda Water." The information further states that defendant is 47 years old and lives in Punta Las Marías in Santurce and that he presented himself at the Prosecuting Attorney's Office, District of San Juan, accompanied by his attorney, while the police were searching for him in different places of the capital; that informations were filed by the judge of the Superior Court, Mr. Baldomero Freyre, who fixed the bail bonds for $12,000 after Prosecuting Attorney Zoilo Dueño González prepared the record of the case; and that it was known that Mr. Abella Blanco immediately posted the bail bonds. That the investigation established that Mr. Abella Blanco wounded the Seraballs as the culmination of a series of disagreements between the three partners in business matters; that the event occurred in the very office of the Santurce Soda Water where Mr. Abella and his partners were having a meeting to discuss the sale of their business; that it was alleged that Mr. Abella discussed excitedly with Mr. José Seraballs, Manager of the firm, and using a .22 caliber pistol fired the first shot at Mr. Pedro Seraballs and then fired two shots at Mr. José Seraballs one of which wounded him seriously in his head. The report continues stating that according to Pedro Seraballs' testimony before the prosecuting

attorney, Mr. Abella, after firing the shots left through the main entrance of the office which he locked by means of a latch on the outside and a few minutes later some of the factory employees found the Seraballs wounded and took them to Río Piedras District Hospital; that the hospital stated that Mr. José Seraballs' condition was serious and that he was being submitted to emergency operations; that the Seraballs lived in the Frailes section in Guaynabo and that prior to said event the police of Puerto Nuevo had received a complaint from Mr. Abella Blanco in which he complained of certain actions of his partner Mr. José Seraballs. This is as far as the report goes. It mentions Mr. Abella Blanco by his name six times. It does not mention Mr. Romany at any time.

In the first edition of the newspaper El Mundo corresponding to Friday, May 26, 1961, No. 15497, a notice appears on the third column of the front page and more or less in the lower half of the page, in a square under the caption "Correction" which reads as follows:

"Through an error, which El Mundo sincerely regrets, in the final edition there appeared on the front page a photograph of Mr. Jorge Romany identified with the name of Mr. Frank Abella Blanco.

"The photograph was taken in the prosecuting attorney's office, when Mr. Abella Blanco was being examined in relation to the shooting assault against Mr. José Seraballs Salot and Mr. Pedro Seraballs Aulet.

"Mr. Jorge Romany was at the prosecuting attorney's office as counsel for Mr. Abella Blanco.

"Mr. Jorge Romany is known in the professional and social circles of Puerto Rico and is a man of the highest esteem among the men of this House."

The type used in said "correction" is darker or larger than the information contained in the columns next to it, and between the lines dividing the columns and side margins of the "correction," there is a blank space of 1/4 inch on

each side and thus the "correction" is objectively made conspicuous.

In said first edition of May 26, 1961, but on page 36, the information published by the newspaper in the final edition of the 25th is identically reproduced, except that Mr. Romany's photograph is now in the right-hand corner and under the photograph, identifying it, appears the following: "Mr. Jorge Romany, Mr. Frank Abella's counselor." In the same number 15,497 of May 26, 1961, now in its final edition, the "correction" previously transcribed is reproduced in identical form, only that it now appears in the first page but in the seventh column in the upper half of the newspaper.[1]

Mr. Romany filed a complaint for damages against El Mundo in the Superior Court, San Juan Part. After stating certain essential facts which were admitted, he alleged that the report, "although true as to the facts stated therein, referred to another person, an attorney also, and it did not refer to plaintiff and due to defendant's negligence it put in circulation in its first* edition of said day plaintiff's photograph who is an attorney too and practices his profession in the island of Puerto Rico." The eighth averment stated "that as a result of the negligence of defendant and its employees plaintiff was subject to disagreeable jokes, he was subject to public contempt," and in the tenth averment,

---

[1] In the record we have found no evidence as to the exact time when the first and second edition of El Mundo start circulation. But it is a familiar fact that the first edition of the issue corresponding to a certain day is in circulation in the afternoon of the previous day, and the second edition, in the morning of that day. Mr. Romany's photograph identified as Mr. Frank Abella Blanco was in circulation in the morning of Thursday, May 25, 1961; in the afternoon of said day the issue of Friday 26th with the correction was in circulation and it reproduced the information and the photograph, this time identifying him as Mr. Jorge Romany, counsel for Mr. Frank Abella. In the final edition of the 26th which was in circulation in the morning of the same day the correction appeared again on the front page.

* It was on the second.

"that although defendant, in its edition of May 26, 1961 rectifies its negligence and error with an explanation, said rectification was not properly made because it did not publish plaintiff's photograph." Apparently, said action was predicated on an allegation of negligence and error on the part of defendant which caused damages to plaintiff. Defendant's contention was that it acted through inadvertence and not through negligence.

Aside from what was stated at the beginning taken from the documentary evidence admitted consisting of the pertinent editions of El Mundo, the trial court made the following findings of fact: (1) that the photograph was taken by the photographer of El Mundo, Inc., Luis Casenave, on May 24, 1961 in the afternoon hours at the prosecuting attorney's office, District of San Juan, when Mr. Abella Blanco was being examined in relation to the shots he had made against his partners in a commercial enterprise. Mr. Jorge F. Romany was in the prosecuting attorney's office with Mr. Celestino M. Iriarte, Jr., accompanying their friend, Mr. Abella Blanco; (2) that the photograph was taken while Mr. Abella Blanco was being interrogated in relation to the shooting assault against Mr. José Seraballs and Pedro Seraballs Aulet; (3) that as a result of the publication of plaintiff's photograph "identifying him as accused of having committed shooting assaults," he was subject to disagreeable jokes by friends and acquaintances in public places and in the presence of other persons unknown to plaintiff; (4) that he received numerous telephone calls at his home as well as in the office relating to said incident, which caused him serious troubles, inconveniences and anguish causing him to become seclusive and annoyed, because his peace had been disturbed by the incident and the resulting consequences; (5) that a month after the publication and at the "Cafetería Manolín" in San Juan, Puerto Rico, Octavio Costas, while talking to Mr. Antonio Castro Fernández, and believing that plaintiff, who

was there, was Mr. Abella Blanco, referred to plaintiff as "such a peaceful person in spite of having killed a person." That plaintiff felt great anguish and deep mental disturbance, when he learned of the incident.

As a matter of law the trial court decided the case pursuant to the provisions of law applicable to libel. It considered the case as a libelous publication per se which carries with it the element of malice for charging a stranger with the commission of an act constituting a public offense. It concluded that plaintiff was not bound to establish malice on the part of defendant for it originated "from defendant's negligent and hasty action in taking a photograph of a person without ascertaining the person's identity, publishing it connected with the imputation of a crime." That the publication was libelous per se and false "because it erred in identifying, naming or describing plaintiff as the person to whom the information refers" and even if the information were privileged if there had been no error in plaintiff's description or identification, as the person to whom the publication referred, "the falsity of the publication, as to plaintiff, made it libelous per se." In the light of said conclusions it sustained the complaint, as a libelous publication, and considering that the damages were partly mitigated by the correction published, ordered defendant to pay compensation of $8,000 plus $1,000 for attorney's fees.

Both parties filed petitions for review. Plaintiff as to the amount, because he believed that the trial court should have taken judicial notice of all damages that the publication could have caused him even if plaintiff had not introduced evidence as to each and every one of the specific actions, consequence of the publication. Defendant attacks the judgment because it is contrary to the evidence and the facts, and the amount granted for damages is excessive.

As to what happened in the anteroom of Prosecuting Attorney Dueño's office, the evidence is conflicting. The trial

court did not make detailed findings of fact as to what occurred therein, and it is fitting to make a summary of the evidence in the record to this respect. Plaintiff Mr. Romany testified that about 4:30 in the afternoon on May 24, 1961 he went to Prosecuting Attorney Dueño's office to aid and accompany Mr. Frank Abella who was arrested for examination by the prosecuting attorney; that Mr. Frank Abella, Mr. Celestino Iriarte, Jr., and plaintiff were there, and later Luis de Casenave, employee of El Mundo, arrived. Plaintiff had known Casenave for many years, since the time when plaintiff went to the racetrack in the year 1930. Casenave arrived by the door facing San Francisco Street with a camera, called Mr. Iriarte and they went to the hall outside the room where they talked and conferred. After a while Mr. Iriarte called plaintiff and told him in the presence of Casenave: "Look, Jorge, Casenave wants to take Frank's photograph. I have said no." "My opinion is the same, that no photograph should be taken." Casenave then answered that he was going to take the photograph anyway, because there were photographers of El Imparcial and San Juan Star on the roofs and different places waiting for him to leave the court. That then, plaintiff withdrew and went to talk to Mr. Abella and when he was thus talking he noticed that Casenave was focusing on them. They were both there, plaintiff and Mr. Abella. Then, Mr. Abella rose from where he was seated and left. Plaintiff was standing and Casenave took the photograph and left. Casenave worked with the lens of the camera focusing on plaintiff and Mr. Abella. He left as soon as he took the photograph without talking to them. That afternoon plaintiff acted as surety for his colleague Mr. Abella.

On cross-examination by defendant, Mr. Romany testified that he was a close friend of Mr. Abella and wanted to be his surety; and of Mr. Celestino Iriarte. That Mr. Abella was seated on a chair and plaintiff was standing by his side

speaking to him; that when Casenave entered, Mr. Iriarte and plaintiff were standing nearby and Mr. Abella was seated; that as a friend and counselor he was interested in preventing the taking of Mr. Abella's photograph; that he presumed that Casenave did not know who Mr. Abella was, when he took plaintiff's photograph;[2] that he used a big camera, one of those 10 square inches, and not a small Polaroid; that he saw Casenave when he was focusing on him; that he did not tell him not to take the photograph; that when Abella got up from the chair plaintiff looked forward and saw Casenave focusing on him and there he took the photograph; that he was sideways and when he saw that Mr. Abella rose, he turned his face completely and faced front as he appears in the photograph; that is, he turned front to see what was going on; that at the time when Casenave was focusing on him he was facing front but about 8 to 10 feet away. That the photograph he objected to was Mr. Abella's. That Mr. Abella was not present when they talked in the presence of Casenave of not taking a photograph of him.

On the other hand Casenave's version of the incident given in court was the following: On examination as to whether on May 24, 1961 he personally knew Mr. Jorge F. Romany he answered that he knew him as a boy, that he was an athlete, that he had not seen him since he was a boy, and that he did not know Mr. Frank Abella Blanco. On entering the ante-room of Prosecuting Attorney Dueño's office the only person he knew there was Mr. Celestino Iriarte who was seated beside Mr. Romany, whom he later knew as Mr. Romany. He asked him (Mr. Iriarte) who was the defendant and he pointed to Mr. Romany. He asked whether he could take his photograph and he nodded and then he took Mr. Romany's

---

[2] Plaintiff expressed himself in this manner: "Q. But Casenave did not know Mr. Abella?"—A. "I presume he did not. If he took my photograph evidently he did not know Mr. Abella."

photograph without flash in the anteroom of Prosecuting Attorney Dueño's office. That he took the necessary time to adjust the camera, focus, set the shutter, taking it to his eyes, find the lock and shoot; that when he was adjusting the camera he was facing Mr. Romany; that Mr. Romany at no time told him that he was not the accused, nor forbid him to take his photograph; that at no time he went out to the hall to talk to Mr. Iriarte but that Mr. Iriarte and Mr. Romany were seated; that Mr. Romany was seated wearing dark glasses; that somebody else was seated on the left side but he cannot determine exactly who it was "because I went directly to the only person I knew there, who was Mr. Iriarte"; that before Mr. Iriarte told him that that was the accused he did not see him talk with the other person who was beside him; that there was a profound silence and the witness approached Mr. Iriarte.

On cross-examination he said that he only stayed for a few seconds in the office, the time necessary to enter, talk to Mr. Iriarte, take the photograph and leave. He noticed there was some person seated here, but he did not pay any attention; several persons, less than five; that when he talked to Mr. Iriarte, Mr. Romany was beside Mr. Iriarte, in front of the witness; that when he asked for the accused Mr. Iriarte pointed to Mr. Romany; the two of them were alone. That he did not talk to Mr. Romany, "besides, I did not know him. As a boy, when he was young and had hair and then he had dark glasses." He denied that Mr. Iriarte, he, and Mr. Romany talked in the hall. He agreed that addressing Mr. Iriarte and not Mr. Romany, he stated that it was better to take photographs here (of Mr. Abella), because El Imparcial and the San Juan Star were outside.

Mr. Iriarte testified that he was there with Mr. Romany and Mr. Frank Abella. They were seated indistinctly in any chair in the anteroom of Prosecuting Attorney Dueño's office when Casenave arrived. He remembers he talked to Casenave

in the hall of the anteroom. He does not know whether Casenave asked him who was Mr. Frank Abella or whether the witness told Casenave who was Mr. Frank Abella. He said that Casenave stated that he wanted to take Mr. Frank Abella's photograph and he asked him not to take it because he was his colleague and as a favor he asked not to give too much publicity to what occurred to his colleague Frank Abella. Casenave said "anyway they are going to take photographs." Then he called Mr. Romany, who according to his best recollection, was in the anteroom and told him: "Jorge, Casenave wants to take Frank's photographs," and that to this Jorge said that the photographs should not be taken to avoid publicity, Casenave being present. That after this, he does not remember where the witness was sitting or where Mr. Romany sat and where Mr. Abella sat, but while he was in the anteroom, Mr. Romany's photograph was taken and he does not remember whether he posed or not. That as he remembers he could not have been the one who pointed Mr. Romany as Mr. Abella to Casenave because he knew both of them. He could not say whether there was the possibility that he had made a careless or inaccurate indication toward Romany which would have caused a mistake. That he wondered why Mr. Romany's photograph was taken and made a remark to him, but he did not tell Casenave after the photograph was taken that it was Romany's photograph. The witness stated that he actually does not remember whether at any time he pointed out Mr. Frank Abella to Casenave; that he does not remember either whether at any time he saw Mr. Romany pointing Mr. Frank Abella out to Casenave.

The trial court did not set forth which of the conflicting versions it believed. However, there is an uncontrovertible fact, irrespective of whether Casenave took plaintiff's photograph knowing that it was he, or whether he took his photograph in the belief that he was Mr. Abella. Plaintiff did not

object to having his photograph taken in relation to the matter involved, and at that place. He has not objected either to the publication when his photograph appeared duly identified with his person, in the first edition of the next issue.

With this state of fact in the record as a background, the trial court decided in law that El Mundo committed libel against plaintiff with said publication.

The Act of February 19, 1902,[3] "establishing a civil action for damages for libel and slander" defines libel as the *malicious* defamation of a person made public by writing, printing, sign, picture, representation, effigy, or other mechanical mode of publication tending to subject him to public hatred or contempt, or to deprive him of the benefit of public confidence and social intercourse, or to injure him in his business, or in any other way to throw discredit, contempt or dishonor upon him . . . .

■ It is necessary that the defamation be malicious in order to give rise to an action for damages provided by said Act. Malice is an indispensable element. *Quiñones* v. *J. T. Silva Banking & Commercial Co.*, 16 P.R.R. 661, 664 (1910); *cf. Perea* v. *Gómez Hnos.*, 21 P.R.R. 25, 27 (1914); *Mulero* v. *Martínez*, 58 P.R.R. 322, 325 (1941). Nevertheless, the Act provides that malice shall be presumed to exist in any defamatory or slanderous communication or writing addressed to any person other than to a relative within the third degree or to a person whom the author has under his guardianship or when said communication passes between persons having business in partnership, or other similar association. Section 5, Act of 1902. The doctrine has established that in libel the public imputation to a person of having committed a punishable offense is defamatory in its own nature. In that event, and unless it falls within said

---

[3] 32 L.P.R.A. §§ 3141–3149.

exception in § 5, the law presumes that the publication was malicious, that is, that there is libel.

■ But the Act of 1902 also establishes—§ 4—that a publication shall not be deemed malicious when made in *fair and true* report of a judicial, legislative or any other proceeding, or of anything said in the course thereof. In such a case the law shall not presume malice in the publication, and it is necessary that malice shall be proved irrespective of the publication itself if damages are sought under said statute and these shall be proved specifically.[4]

The case at bar presents its own characteristics which do not wholly compare with the ordinary situation of photograph publications as libel.[5] It is fitting to analyze and decide it in the light of its particular characteristics.

Taking the publication of plaintiff's photograph identified as Mr. Frank Abella Blanco's absolutely independent of the accompanying publication, the improperly identified photograph would not be libelous by itself. Ordinarily, plaintiff would not have felt defamed if his photograph would have been identified with the person of his close friend and professional colleague.

Taking the publication of the information absolutely independent of the accompanying photograph—where plaintiff is nowhere mentioned, and its details do not suggest that the facts could be related with his actions and his life—the information by itself does not constitute libel either because

---

[4] *Cf. Las Monjas Racing Corp.* v. *P.R. Ilustrado, Inc.*, 58 P.R.R. 930, 937 (1941); *Moraza* v. *Rexach Sporting Corp.*, 68 P.R.R. 433, 436 (1948); *Jiménez* v. *Díaz Caneja*, 14 P.R.R. 9, 13, 14, 18, 19 (1908); *Rivera* v. *Martínez*, 26 P.R.R. 692, 696, 697 (1918); *Caraballo* v. *P.R. Ilustrado, Inc.*, 70 P.R.R. 265, 272 (1949); *Casanova* v. *González Padín, Co.*, 47 P.R.R. 461, 469 (1934); *Franco* v. *Martínez*, 29 P.R.R. 221, 224 (1921); *Quiñones* v. *J. T. Silva Banking, etc., supra* at 664.

[5] See Thayer's exposition in Legal Control of the Press (1956), "Pictured Libel" 258 *et seq.*; Arthur, The Law of Newspapers (1940), "Photographs" 163 *et seq.*, 172; Swindler, Problems of Law in Journalism 140 (1955); *cf. Peck* v. *Tribune Co.*, 214 U.S. 185.

of the absence of the element of malice.—Section 4. Plaintiff himself alleged that the publication was true as to the facts about the person to whom it referred stated in the news item. There is nothing in the record to show that it does not constitute a fair and true report of said facts, or that the information was published with malicious intent.

■ Consequently, we must take the photograph thus identified and the publication as a whole, as a simple body. Under said circumstances, in which, separately, neither the photograph nor the information constituted libel, plaintiff was bound to prove with evidence, independent of the publication itself, that the improper identification of his photograph with the name of the person to whom the information referred, was a *malicious* action on the part of defendant, in order that the publication as a whole might constitute libel against him for the purpose of having the cause of action for damages provided by the Act of 1902. The present circumstances and the facts as they occurred when the photograph was taken at the office of the prosecuting attorney in San Juan as they appear in the record, would not support a conclusion that El Mundo acted maliciously in the mistaken identification. In the light of the particular facts of this case, we believe it was improper to decide it under the libel statute of 1902.

■■ However, the review is granted against the judgment and not against the grounds. The fact that libel was not proved because of the absence of the element of malice, does not mean that plaintiff was not entitled at law to a compensation on another ground. Section 1802 of the Civil Code (1930 ed.) provides that a person who by an act or omission causes damages to another when there is *fault or negligence* shall be obliged to repair the damage so done. Section 1803 holds directors or owners of enterprises liable for the actions of their employees on account of their duties as such.

If the publication of plaintiff's photograph identified as that of Mr. Abella Blanco at the time of the occurrence of said unfortunate events caused him damages, defendant is legally bound to compensate the damages caused if it be shown, even in the absence of malice, that it acted negligently.[6] According to § 1042, obligations are created by law, by contracts, by quasi contracts, and by illicit *acts and omissions* or by those in which *any kind of fault or negligence* occurs, and every obligation—§ 1041—consists in giving, doing, *or not doing* something. The special statute on libel of 1902 does not impede in this case such compensation under § 1802, even if the presumptions established by said special statute, which alter the standards of evidence generally applicable as to the necessity of proving a fact or to whom the weight of the evidence corresponds, were not applicable.

■ Pursuant to the facts in the record, we understand that the defendant enterprise was guilty of some kind of fault or negligence under the provisions of law cited. If Casenave took plaintiff's photograph in the honest belief, although mistakenly, that he was Mr. Frank Abella Blanco and took the information as such to the newspaper, in the circumstances of persons, time and place shown in the record—§ 1057—he incurred negligence in not verifying or duly ascertaining himself as to the identity of the person photographed, particularly considering his own testimony that at that time he did not personally know either Mr. Romany or Mr. Abella Blanco. On the contrary, if Casenave photographed plaintiff knowing him and he identified the photograph and later when the information was prepared the photograph was published improperly identified, it should also constitute negligence on the part of another employee or clerk of the defendant enterprise. Only that, as § 1058 pro-

---

[6] Harper & James, Law of Torts 369 (1956). *First National City Bank* v. *González Martínez*, (U.S.D.C.-P.R.), 293 F.2d 919. *Cf. Rivera* v. *Martínez, supra* at 696.

vides, no one shall be liable for events which could not be foreseen, or which having been foreseen were inevitable. Under said circumstances, defendant is liable to plaintiff for the damages suffered and which he has proved as a result of the publication. Let us see the record again as to the damages proved.

At the commencement of the trial plaintiff expressly waived the claim for loss of earnings as a result of the facts stated in the complaint. There is no evidence of any other special damage. Plaintiff testified that on reaching his office that morning he started to receive telephone calls from friends and clients in relation to the photograph. He called up Mr. Rivera Cestero, El Mundo's attorney, and informed Mr. Rúa of the occurrence and to please call up the editorial staff to rectify the publication. He believes he received about 25 telephone calls that day, among others one of Emilio Huyke from El Mundo editing staff, to tell him he was sorry for the occurrence and that if he had been there that night when the news item was prepared it would not have happened because he (Huyke) knew plaintiff. That when he went out on the street that day he thought the people looked at him as a result of the publication and he decided to take lunch in the office. He gave up going to a trial which he had that afternoon at the bankruptcy court and requested its suspension preferring to go home, and he felt annoyed. That night while at the bowling center with his wife he received several jokes from friends and bowling companions and he decided to leave the place. Next day on his way to his office and on the road from Bayamón to San Juan he had to take off his glasses during a traffic jam because he was conscious of the fact that as he was wearing glasses in the photograph the persons around him stared at him because of the photograph. He decided to drive without glasses that day and the next. At the beginning of June or July, about a month after the publication, Octavio Costas approached to tell him that

he had mistaken him for Mr. Abella. That Costas had made said statements to Mr. Castro Fernández and the latter had set him right. Plaintiff did not know Mr. Costas. He stated that said situation gave rise to a series of unpleasant jokes which caused him great embarrassment and inconveniences. He felt annoyed. Some jokes came from acquaintances, and he did not mind so much; others came from persons whom he did not like well, and these caused annoyance, and he left the bowling center to avoid a personal offense. Two nights later, at the Caparra Country Club, he was subject to the same jokes. On cross-examination he stated that during a campaign in which he was a candidate for a public position and there was some publicity, his photograph was never published and his only photograph in El Mundo was when he took the bar examination. That said morning he received a call from Radio San Juan asking for an interview; that the 25 calls could have been approximate; that they were more than five because in the morning, when he arrived, his secretary told him that a lot of people had called up and some had talked to her and she had given them an explanation and that was the end of it.

Plaintiff's witness, Vicente Balbás Ortiz, testified having seen Mr. Romany at the Star Bowling Center, with whom he often got together; that as a result of the publication when Mr. Romany entered the bowling center, a group of persons, game companions who played in the same league teased him; that at the time of the jokes plaintiff was serious, he seemed a little annoyed and asked them to stop joking; that the joking continued and he decided to leave the place and left the group.

Octavio Costas testified that he knew plaintiff by sight and often saw him at Manolín's business, where he lunched; that on seeing plaintiff in front of the cash register, he commented: "that man looks so quiet and peaceful and he shot a man down and killed another," because he had seen his

photograph in El Mundo; and on paying the bill he commented in Manolín's presence: "By Jove, this man killed a person" and the other attorney said: "This is Mr. Romany," and he commented: "I thought he had killed someone because I read it." Outside plaintiff told him: "I have killed no one, because I am Mr. Romany." The witness answered: "I thought you had killed somebody because I 'saw' it in the papers." On cross-examination he said that sometimes he read 15 issues of the newspapers in 2 or 3 nights because he was very busy, and on seeing the picture he thought he would not sit next to plaintiff any more while eating lunch at Manolín's business. Aside from the natural annoyance, said witness' testimony does not show special damages.

Section 1056 of the Civil Code provides that liability arising from *negligence* is also demandable in the fulfilment of all kinds of obligations, but *it may be mitigated* by the courts, according to the cases.[7]

▐ In the record of this case there are circumstances and elements of judgment which permit mitigating the liability. Those who only read the first edition of the newspaper El Mundo never learned of the incident. We make this remark because plaintiff, in his petition, in support of his right to greater damages points out the great circulation of the newspaper. All second edition readers who personally knew Mr. Romany or Mr. Abella Blanco, had to understand that there was an error in the identification of the photograph, but they would not believe that plaintiff was charged with

---

[7] The provision of § 1056 is of a general nature, applicable to all kinds of obligations, without it being contradictory to the obligations which arise from §§ 1802 and 1803. It was thus stated in the judgment of the Supreme Court of Spain on December 14, 1894, 76 *Jur. Civ.* 483. *Cf.* 8–1 Manresa, *Código Civil* 196 (5th ed. 1950).

Under an action for libel proper § 131 of the Code of Civil Procedure, which is in force, permits in the answer any mitigating circumstances to reduce the amount of damages, whether the justification is proved or not, and the introduction of the mitigating circumstances in evidence.

the criminal facts. In relation to persons like Costas, the record shows that El Mundo immediately published a note of correction properly conspicuous in addition to the reproduction of the photograph in the correct manner. We already stated that plaintiff did not allege loss of income or any other special damage.

It is unquestionable that the negligence of defendant caused some mental worries and anxiety to plaintiff. Considering all the circumstances of the case, we understand that the pecuniary liability as decided by the trial court must be moderated.

The foregoing disposes of both petitions. The judgment will be modified in the sense of ordering defendant, El Mundo, Inc., to pay damages to plaintiff for the amount of $1,500 and $500 for attorney's fees at the trial court, and as thus modified it will be affirmed.